IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

               Plaintiff,

v.

DIDION MILLING, INC., DERRICK CLARK,
SHAWN MESNER, JAMES LENZ, JOSEPH
WINCH, ANTHONY HESS AND JOEL NIEMEYER,

               Defendants.

OPINION and ORDER

22-cr-55-jdp

This order addresses most of the pending motions filed by defendants, grouped as follows: (1) motions to dismiss one or more counts; (2) the motion to sever Count 2; (3) motions to strike; and (4) defendants' discovery and other procedural motions. The court will address the government's motion for discovery, Dkt. 200, in a separate order.

## A. Motions to dismiss

### 1. Vagueness (Counts 2, 4, and 7–9)

Count 2 charges Didion with the willful violation of an OSHA regulation causing the death of an employee, in violation of 29 U.S.C. § 666(e). Count 4 charges all seven defendants with a conspiracy to commit multiple crimes. Count 7 charges five defendants with making or using false statements in a matter within the jurisdiction of OSHA. Count 8 charges Hess with obstructing an agency proceeding and Count 9 charges Clark with obstructing an agency proceeding. The regulatory section at issue in Count 2 is 29 C.F.R. § 1910.272(j), and Counts 4, 7, 8, and 9 incorporate that regulation by reference. *See* Dkt. 8, ¶¶ 51, 123, 126 and 128. Didion, Clark, and Hess challenge § 1910.272(j) as unconstitutionally vague and seek dismissal of Counts 2, 4, 7, 8, and 9 on that ground.

Section 1910.272(j) is the Grain Handling Standard, the purpose of which is to control grain dust fires and explosions in facilities that process grain:

> **Scope**. This section contains requirements for the control of grain dust fires and explosions, and certain other safety hazards associated with grain handling facilities. It applies in addition to all other relevant provisions of part 1910 (or part 1917 at marine terminals).

29 C.F.R. § 1910.272(a). The specific regulation charged in the indictment involves the requirement that grain handling facilities have a housekeeping program:

> The employer shall develop and implement a written housekeeping program that establishes the frequency and method(s) determined best to reduce accumulations of fugitive grain dust on ledges, floors, equipment, and other exposed surfaces.

29 C.F.R. § 1910.272(j)(1). The indictment alleges that Didion did not have any housekeeping program specifically for the control of fire and explosion, although it had a written sanitation program for food safety. The indictment charges Didion with the failure to implement any dust control program, even the sanitation program, causing the death of employees.

Didion contends that the housekeeping program requirement in § 1910.272(j)(1) is unconstitutionally vague because it provides no determinable standard for whether a program "best" reduces accumulations of dust. Didion thus mounts a facial challenge to the constitutionality of the criminal enforcement of § 1910.272(j)(1).

Due process requires that a law clearly define its prohibitions. *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). The required clarity serves two purposes. First, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108. Put simply, statutes must provide "fair warning." *Id.*

2

Second, a statute must provide "explicit standards for those who apply them." *Id.* "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09. A statute is unconstitutionally vague if it fails to provide either fair notice or standards for fair enforcement. But "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

Due process does not require mathematical precision; a statute may impose an imprecise yet comprehensible standard. *See Grayned*, 408 U.S. at 110. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Courts tend to be more lenient in evaluating civil statutes, "because the consequences of imprecision are qualitatively less severe." *Id.* at 499. But when a constitutional right is at stake, the court must apply a "more stringent vagueness test." *Karlin*, 188 F.3d at 458. The housekeeping program requirement is itself a civil regulation, but because it serves here as the basis for a criminal charge, it is subject to the more demanding review required of criminal law. *See Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001) ("Civil statutes or regulations that contain quasi-criminal penalties may be subject to the more stringent review afforded criminal statutes."); *Chatin v. Coombe*, 186 F.3d 82, 86–87 (2d Cir. 1999) (applying criminal vagueness standard to civil rule because the rule "carries penalties which are more akin to criminal rather than civil penalties").

3

The first problem with Didion's motion is the longstanding general rule that one whose conduct clearly falls within the scope of a law cannot bring a facial vagueness challenge. *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020). Here, Didion is not charged with maintaining a housekeeping program that failed to meet the purportedly vague "best" standard. As the government puts it, "the allegations in the indictment include that Didion did not follow its own housekeeping plan, such as it was." Dkt. 176, at 18. As the court reads the indictment, it also alleges that Didion failed to develop a written housekeeping program designed for fire and explosion prevention at all. Dkt. 8, ¶ 37. In neither case—whether the charge is failing to develop a written plan or failing to implement one—is Didion charged with having a plan that failed to meet the challenged "best" standard.

Didion argues that the general rule doesn't apply when the challenged law has no ascertainable standard for measuring compliance, because in such a case, the court would not be able to tell whether the challenger's conduct clearly falls within the standard. Dkt. 194, at 5. Didion relies on primarily on *Johnson v. United States*, 576 U.S. 591 (2015), which held that the residual clause in the Armed Career Criminal Act was unconstitutionally vague. The Supreme Court granted certiorari to decide whether Minnesota's offense of unlawful possession of a short-barreled shotgun was a violent felony under the residual clause. But the Court, on its own initiative, asked for reargument on the issue of vagueness. So, although *Johnson* held that the residual clause was facially vague, the case did not involve a facial challenge brought by one whose conduct was plainly within the scope of the challenged law. *Johnson* did not expressly abrogate the general rule that limits who may bring facial vagueness challenges.

In *Cook*, the Seventh Circuit rejected the notion that, after *Johnson*, facial challenges can be brought by "any defendant who can postulate doubts as to what particular conduct a

criminal statute does or does not reach." 970 F.3d at 876. *Johnson* laid to rest the notion that a defendant must show that the challenged statute is vague in every application. *Id*. And *Johnson* also makes clear that a showing that some conduct plainly falls within the scope of the statue does not save it from a vagueness challenge. *Id*. But the Seventh Circuit regarded the Armed Career Criminal Act as sui generous, because the defendant's predicate offenses are subject to the rigors of categorical analysis, in which the defendant's own conduct is never at issue. The bottom line is that neither *Johnson* nor *Cook* abrogates the general rule that one whose conduct clearly falls within the scope of a statue is not entitled to challenge the statue as vague based on hypotheticals that don't apply to it. Didion is not charged with failing to meet the standard that it now challenges as vague, so it is not entitled to challenge the constitutionality of that standard.

Nevertheless, the court will briefly consider the merits of Didion's vagueness challenge. Didion's core argument is that the housekeeping program requirement is vague because it doesn't have an objective, measurable standard for grain handling facilities other than grain elevators. This argument rests on an assumption that § 1910.272(j)(1) threatens employers with prosecution if they do not correctly determine what the "best" method of reducing dust accumulation. But that is not the most reasonable reading of the regulation. A better reading is that the regulation requires employers to develop a program that the *employer* has "determined" is best in its own judgment to reduce dust accumulation. In other words, the employer is required to develop a program in good faith, not to develop the "best" program under some unknowable standard.

This conclusion is supported by OSHA's announcement of the final rule:

> OSHA has been convinced that all grain facilities should
> implement a housekeeping program because of its recognized

> importance in controlling dust. After analysis of the record, OSHA has also concluded that it is important that the housekeeping program be in writing because it establishes the planned actions that the employer expects to be taken in relation to dust control; it provides a measure of compliance with respect to those planned actions; and, it apprises employees of their duties and responsibilities for controlling dust in the grain handling facility.
>
> Further, OSHA agrees with those rulemaking participants who suggested that the housekeeping requirements be performance-oriented. The Agency believes it is important for the employer to have the necessary flexibility to choose the most economical and feasible dust control method, or combination of methods, that will best reduce dust accumulations.

52 Fed. Reg. 49592-01, at 49608. The regulation itself specifies the purpose of the dust-control rule, and the housekeeping requirement requires employers to prepare and implement a written plan that reduces accumulation of fugitive dust. But it leaves the means of accomplishing the goal to the employer, in recognition of the varying circumstances existing in the wide variety of grain handling facilities subject to the rule. OSHA's announcement of the final rule makes crystal clear that the accumulation of some fugitive dust in grain handling facilities is inevitable, but that it poses widely recognized danger that should be reduced.

The housekeeping requirement thus imposes three core requirements on every covered employer: come up with a plan with the objective of reducing the risk of fire and explosion; put it in writing; and follow it. Reading the regulation fairly and as a whole, recognizing the intended flexibility afforded to non-grain elevator employers, an employer who had prepared a written plan in good faith and followed it, is not vulnerable to prosecution because an employer has not come up with the "best" method of reducing dust.

The court concludes that the housekeeping requirement has an ascertainable core standard that provides adequate notice to those covered by it, and that it does not invite arbitrary and discriminatory enforcement.

### 2.   Intracorporate conspiracy doctrine (Counts 1 and 4)

Both Count 1 and Count 4 charge conspiracies between Didion and multiple employees. Didion moves to dismiss these charges because, under the intracorporate conspiracy doctrine, the employees of a corporation cannot conspire with each other or the corporation itself.

The intracorporate conspiracy doctrine applies to antitrust cases under Section 1 of the Sherman Act, which require anti-competitive behavior among competing businesses. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). So coordination among the employees of a single firm, or between a firm and its subsidiaries, does not meet the statutory requirement of a "plurality of actors." *Id*. Didion contends that the intracorporate conspiracy doctrine applies in other contexts, and it should apply here. But that's a dubious proposition.

Didion cites *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972), as an example of the application of the intracorporate conspiracy doctrine outside the antitrust context—in a discrimination case brought under the Civil Rights Act. One of the statutes at issue, 42 U.S.C. § 1985(3), prohibits "two or more persons" from conspiring to violate the civil rights of any person. The court of appeals held that "a single act of discrimination by a single business entity" would not constitute acts by two or more persons, even if the discriminatory decision was the product of deliberation among multiple agents of the business entity. The court didn't use the term, but it invoked a principle similar to the intracorporate conspiracy doctrine to hold that discrimination by a single business was not actionable as a conspiracy under § 1985(3).

As the government points out, several courts of appeals have expressly held that the intracorporate conspiracy doctrine is inapplicable to criminal conspiracy prosecutions. *See United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th Cir. 1994); *United States v. Stevens*, 909 F.2d 431, 432 (11th Cir. 1990); *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir.1984); *United States v. Ames Sintering Co.*, 927 F.2d 232, 237 (6th Cir. 1990).

Didion suggests that because the Seventh Circuit is not among those courts, this court should invoke the intracorporate conspiracy doctrine here as a matter of sound policy. But the court does not have that leeway. As the government points out, the Seventh Circuit has repeatedly affirmed conspiracy convictions of corporations and their officers, employees, and agents. *See, e.g., United States v. Martel*, 792 F.2d 630, 633 (7th Cir. 1986) (corporation, president, and vice president convicted of conspiring with each other to defraud the government); *United States v. McCulley*, 178 F.3d 872, 873 (7th Cir .1999) (four employees convicted of conspiracy to conceal company practices from federal agency); *United States v. Johnson*, 927 F.2d 999, 1000 (7th Cir. 1991) (business owner and employees convicted of conspiracy to commit fraud); *United States v. Weisman*, 736 F.2d 421, 423 (7th Cir. 1984) (six employees of company convicted of conspiring to defraud customers). And in *Dombrowski*, the Court of Appeals explained that the principle underlying the doctrine was not universally applicable to criminal conspiracies:

> We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan [the original targets of § 1985(3)] certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon.

*Id.*

Even if the court had the leeway to do so, the court is not persuaded by Didion's policy argument. It may make sense to treat a corporation and its agents as a single entity in the context of certain Sherman Act conspiracies and in the context of some conspiracies to discriminate. But it does not make sense to expand the concept to criminal conspiracies generally. The court discerns no fundamental unfairness in ascribing to a corporate entity the acts of its agents, and at the same time holding those agents responsible for their own actions, and also holding the corporation and its agents responsible for their coordinated illegal activities. Under Didion's expansive view of the intracorporate conspiracy doctrine, every savvy drug trafficking organization would incorporate to stave off conspiracy charges against its members.

Didion's motion to dismiss Count 1 and Count 4 as barred by the intracorporate conspiracy doctrine is denied.

### 3.  Failure to plead a scheme to defraud (Count 1)

Count 1 charges defendants Didion, Clark, Mesner, Hess, and Niemeyer with conspiracy to commit interstate carrier fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. The charged conspiracy involves deceiving food safety auditors about Didion's sanitation practices, so that the auditors would certify the safety of Didion's milled corn, and Didion could continue to sell the corn to its customers.

Didion moves to dismiss Count 1 on the ground that it does not allege a scheme to defraud, but merely a scheme to deceive. The missing element, according to Didion, is that the indictment does not allege that Didion's customers were deprived of anything: they got the milled corn they paid for at the price they agreed to pay.

Didion invokes the principle that there is "a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019) (citing *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015), which quoted *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). The parties agree that both federal fraud statutes charged in this case require that the defendant intend to deprive the victim of something of value. Didion contends that its customers got what they paid for: milled corn, which the indictment does not allege was tainted or deficient in any way. The government says that Didion's customers did not get what they paid for, because the milled corn was falsely certified as safe.

Didion relies on several cases in which sellers were alleged to have been defrauded by buyers, rather than the more typical situation in which the buyer is the fraud victim. For example, in *United States v. Shellef*, the victim sold a regulated chemical to the defendant on the basis of the defendant's representation that the defendant would not resell the product in the United States. 507 F.3d 82, 107 (2d Cir. 2007). The seller would not have sold the chemical if the defendant had been honest that he intended to sell it in the United States. The government argued that the seller was deprived of the right to control the terms of the sale of its property. But the Second Circuit held that the indictment did not state an offense, because the victim seller was not deprived of an essential element of the bargain. A deceptive

10

inducement to the transaction was not enough to support a wire fraud charge. The abstract right to control of the terms of sale was not an essential term of the bargain.[1]

The government argues that the problematic cases are the unusual ones that involve sellers as the victim. According to the government, a victim buyer is always deprived of something essential to the transaction—its money. That might be true as a rule of thumb, but it doesn't quite address the question here, which is whether Didion's customers were deprived of an essential term of the bargain. The indictment does not allege that Didion's milled corn was tainted or unsafe, so the corn Didion's customers got had all the physical properties they bargained for. But if Didion's customers had bargained for *certified* milled corn, then they didn't really get what they paid for. The case here is similar to *United States v. Heon Seok Lee*, 937 F.3d 797, 810 (7th Cir. 2019), in which the Seventh Circuit affirmed a conviction for wire fraud on the basis of false statements by the defendant seller that his goods were made in the United States. The procedural posture of *Heon Seok Lee* is different—the issue was raised in a challenge to the sufficiency of the evidence. But it's hard to read the case as antagonistic to the government's position here.

And, as the government points out, even some of the cases cited by Didion as distinguishable involve fraud based not on the inherent qualities of the product, but on some attestation or certification about the product or the use to which it would be put. For example,

---

[1] In *Ciminelli v. United States*, No. 21-1170, 2023 WL 3356526, (U.S. May 11, 2023), the Supreme Court held that the Second Circuit's "right to control" theory could not support a wire fraud conviction. "Potentially valuable economic information" necessary for informed economic decisions is not "property" for purposes of the wire fraud statute. *Ciminelli* reinforces the principle that interference with the abstract right to control one's property is not actionable as wire fraud. But nothing in *Ciminelli* undermines the court's conclusion here that a false certification about the origin or quality of a good sold could support a wire fraud claim.

*Kelerchian* involved a false representation that the buyer would resell firearms only to police, when they were actually going to be sold to private parties, which was sufficient to support a conviction based on wire fraud. *United States v. Pritchard*, 773 F.2d 873 (7th Cir. 1985), involved the purchase of electronic surveillance equipment by a buyer who falsely portrayed himself as a representative of a state agency. The false affiliation with the state led the seller to believe that the buyer was creditworthy, and thus the court of appeals held that the evidence supported a wire fraud charge.

The indictment charges defendants with defrauding Didion's customers by fraudulently securing a food safety certification. Whether the food safety certification is an essential term of the bargain between Didion and its customers is a fact question that will be decided at trial. But the indictment alleges all the elements of a conspiracy to defraud.

### 4.  Duplicitous charge (Count 4)

Count 4 charges all seven defendants with a single conspiracy to commit three offenses against the United States: (1) making or using a false writing or document in matters within the jurisdiction of agencies of the United States; (2) falsifying a document in relation to a federal investigation; and (3) obstructing an agency proceeding. The object of the conspiracy was to conceal violations and unsafe conditions from auditors and government agencies.

Lenz and Didion move to dismiss Count 4 as duplicitous. A "duplicitous" count charges more than one separate offense in a single count, contrary to the requirement in Rule 8(a) of "separate" counts for multiple offenses. *United States v. Buchmeier*, 255 F.3d 415, 421 (7th Cir. 2001). The evil of duplicitous charging is that it may fail to provide proper notice to the defendant, it may muddle the effect of evidentiary rulings, and, most important, it may make it impossible to tell if the verdict on each offense is truly unanimous. *Id*. at 425. Dismissal is

not automatic: a duplicitous count must be dismissed only if it is prejudicial. *Id*. Prejudice can often be ameliorated by careful jury instructions. *Id*.

Defendants contend that Count 4 charges at least two separate conspiracies and courses of conduct, one designed to conceal violations of Didion's construction permit by falsifying the bag pressure logs, and second designed to conceal unsafe dust conditions from auditors and government agencies. Defendants argue that the falsification of the MSS involved a different set of actors (Didion, Clark, Mesner, Hess, and Niemeyer) from those involved in the falsification of the bag pressure logs (Didion, Clark, Lenz, Hess, and Niemeyer), and yet a different set of actors presented the baghouse regulators (Didion, Clark, Lenz, and Winch).

The fundamental problem with the motion is that the indictment charges all these acts as part of a single conspiracy, whose objective was to conceal Didion's unlawful activity from authorities, and which involved the agreement to commit multiple offenses in service of this common objective. There is no requirement that all of the conspirators played the same role or participated in each aspect of the conspiracy. *United States v. Magana*, 118 F.3d 1173, 1186 (7th Cir. 1997). The charged conspiracy is a capacious one. But the gist of the crime is the agreement to commit offenses, and the scope of a conspiracy is determined by the agreement among the conspirators. *United States v. Bruun*, 809 F.2d 397, 405 (7th Cir. 1987). It will be a question of fact for the jury whether each of the seven defendants was a member of the overarching conspiracy. Count 4 is not duplicitous.

### 5.  Multiple challenges to Count 6 and Count 7

Count 6 charges all defendants except Mesner with making false entries in a record in a matter within the EPA's jurisdiction. The gist of this charge is that these defendants falsified the Didion baghouse pressure logs for 2015, 2016, and 2017, and then Winch sent these logs

to the Wisconsin Department of Natural Resources in August 2017 as part of its environmental compliance obligations.

Lenz moves to dismiss Count 6 under Rule 12(b), alleging that the count fails to state an offense and that it is unconstitutionally vague because it does not allege the particular false statement that Lenz is charged with making. More specifically, Lenz contends that Count 6 is deficient for the following four reasons:

> (1) it fails to allege that Lenz acted with the intent required to aid and abet Joseph Winch in submitting a false statement to the WDNR;
>
> (2) it is time barred as to Lenz, whose latest-in-time alleged act was more than six years before the Indictment was returned;
>
> (3) it is unconstitutionally vague under the Fifth and Sixth Amendments; and
>
> (4) it must be dismissed in part because it fails to allege that Lenz aided and abetted making a false statement in the 2017 baghouse logs.

Dkt. 195, at 2.

Count 7 charges defendants Didion, Clark, Messner, Hess, and Niemeyer with an offense similar to that charged in Count 6 but involving the falsified MSS logbook. Hess joins Lenz's motion to dismiss Count 6 and makes his own motion to dismiss Count 7 asserting the same grounds. The court will not separately address Hess's Count 7 motion; the analysis applies to both.

As presented in Lenz's opening brief, Dkt. 141, his motion is predicated on the idea that Lenz must have been charged with aiding and abetting the completed crime, because Lenz had left the company by the time Winch sent the falsified baghouse pressure logs to the DNR. So Count 6 is deficient, the argument goes, because the indictment does not specifically allege

14

Lenz's intent to aid and abet Winch, and it would be time-barred because the statute of limitations runs from Lenz's false statement, and Lenz made no false statements within the five-year limitations period.

The government rebutted these arguments in its opposition brief. Dkt. 29. Aiding and abetting need not be specifically charged, because it is not a separate crime but merely a theory of liability implicit in every charge. *United States v. Powell*, 652 F.3d 702, 708 (7th Cir. 2011). "Aiding or abetting is a proper basis of conviction in every prosecution." *United States v. Newman*, 755 F.3d 543 (7th Cir. 2014) (citation omitted). The indictment is not deficient because it fails to allege Lenz's intent to aid and abet Winch.

Aiding and abetting is not the only basis for Lenz's liability; he might also be convicted on the basis of his vicarious liability for crimes committed by his co-conspirators, under the principles in *Pinkerton v. United States*, 328 U.S. 640 (1946). Like aiding and abetting, *Pinkerton* liability need not be specifically charged. *United States v. Brown*, 973 F.3d 667, 710 (7th Cir. 2020). Even if it is true that Lenz left the company when he says, that does not mean that he withdrew from the conspiracy. *States v. Nagelvoort*, 856 F.3d 1117, 1128-29 (7th Cir. 2017). Withdrawal requires an affirmative act of disavowal, not just a cessation of active participation. *Id*.

As for the statute of limitations issue, that raises a defense that relies on facts not alleged in the indictment, so it's not appropriate for resolution under Rule 12(b). But even if the factual basis were true, Lenz's statute of limitations defense is flawed. An offense is committed for statute of limitation purposes when it is completed, which is when each element of the offense has occurred. *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999). Lenz must have taken an affirmative act in furtherance of the crime to be liable as an abettor, but Lenz's act need not

be taken within the limitations period. *United States v. Erb*, 543 F.2d 438, 446 (2d Cir. 1976). The same principle would apply to Lenz's liability as a conspirator. *Smith v. United States*, 568 U.S. 106, 111 (2013).

Lenz implicitly concedes in his reply brief that the government is correct on these points. Lenz says that the government has recast three of the bases for his motion (enumerated 1, 2, and 4 above) as fact issues that would need to be resolved at trial. That, of course, would make it inappropriate to resolve these three issues on a motion under Rule 12(b), which applies only to motions that can be decided without trial on the merits. *United States v. Covington*, 395 U.S. 57, 60 (1969); *United States v. Shriver*, 989 F.2d 898, 906 (7th Cir. 1992).

Lenz makes two main arguments in reply. First, Lenz contends that the government can't rely on *Pinkerton* liability because Count 4 alleging the conspiracy must be dismissed as duplicitous. The court rejects this argument for reasons given in response to the motions to dismiss Count 4.

That leaves Lenz's argument the Count 6 is unconstitutionally vague because it charges a single false statement and does not specify what that statement is. Lenz puts a lot of weight on *United States v. Hinkle*, 637 F.2d 1154, 1158 (7th Cir. 1981), which concerned an indictment charging a violation of 18 U.S.C. § 843(b), use of a communication facility to cause or facilitate a controlled substance offense. *Hinkle* held that an indictment under § 843(b) must specify "the type of communication facility used, the date on which it was used, the controlled substance involved and some sort of statement of what is being facilitated with that controlled substance which constitutes a felony. *Id*. The indictment in *Hinkle* was deficient because the counts didn't specify what drug was involved. Lenz argues that *Hinkle* is directly analogous to Count 6.

16

The Fifth and Sixth Amendments require that an indictment inform the accused of the charges against him clearly enough to serve two functions. "The indictment must adequately apprise a defendant of the charge against him so that he can prepare his defense. Furthermore, it must establish a record that shows when the defense of double jeopardy may be available to the defendant in the event future proceedings are brought against him." *Hinckle*, at 1157. In evaluating the sufficiency of an indictment, the court reads it practically and as a whole, not in a hypertechnical manner. *United States v. Ramsey*, 406 F.3d 426, 430 (7th Cir. 2005).

If Count 6 did not specify the false statements that Lenz is alleged to have made, his motion would have some traction. But Lenz's reading of the indictment is strained and atomistic. Reading the indictment fairly and as a whole, Count 6 does not charge defendants with making only a single false statement. It charges defendants with falsifying the baghouse pressure logs for 2015, 2016, and 2017. It states that defendants knew that the logs contained "a materially false, fictitious, and fraudulent statement and entry." But "a" false statement is merely the minimum requirement of the statute, which prohibits the making of "any" false statement. The only fair reading of the indictment is that it charges defendants with falsifying the logbooks knowing they contained *at least one* false statement.

Lenz does not dispute that the indictment alleges in detail *how* the logbooks were falsified. That is explained in paragraphs 62, 78, and 79. Lenz's involvement is also specified in the overt acts section of Count 4, specifically in paragraphs 85, 89–91. Lenz insists that the government must specify the specific entries that are false. The court is not persuaded that the indictment must specify the entries. The indictment alleges that the logbooks were systematically falsified. It may even be true that some of the individual entries were accurate.

17

But taken as a whole, the logbooks falsely represent that Didion had complied with its DNR permits.

Lenz has ample information to prepare a defense to the charges against him. And the scope of his double jeopardy rights is clear: he would not be subject to another prosecution for the same crime based on the falsified bag pressure logs for 2015, 2016 or 2017. Count 6 is sufficient to meet the requirements of the Fifth and Sixth Amendments. For the same reasons, Count 7 is sufficient. The motions to dismiss Count 6 and Count 7 are denied.

### 6. Making or using a false statement (Count 7)

Count 7 charges five defendants with making or using false statements in a matter within the jurisdiction of OSHA, an agency of the executive branch, in violation of 18 U.S.C. § 1001(a)(3). The charged false statements are entries in the 2017 MSS logbook, which Didion sent to OSHA on August 24, 2017.

Didion argues that Count 7 does not state an offense because the MSS was provided to OSHA in response to a subpoena that requested all of Didion's "housekeeping schedules and performance log books applicable to the company's corn milling facility from May 31, 2015 to May 31, 2017," and responding to a subpoena cannot violate § 1001(a)(3) because that action does not constitute "making" or "using" a false statement. Didion argues that it was simply giving OSHA what it had asked for, and thus the government is seeking to criminalize the act of honestly responding to a subpoena.

The parties point to no case law that definitively interprets the term "use" in the context of § 1001. But, at this point in the case, the court sees little difference in the parties' view of the scope of § 1001. They apparently agree that "use" means something like "actively employ."

And they apparently agree that simply turning over a document to the government without making any representation at all about its accuracy would not violate § 1001(a)(3).

For this reason, the parties' debate about *United States v. Steele*, 933 F.2d 1313 (6th Cir. 1991), is really beside the point. In that case, the en banc court rejected a view that "a defendant must intend to or actually represent to an agency that the facts contained in the submitted documents are correct." *Id.* at 1319 n.5. Instead, the court held that "the requirement that [the defendant's] conduct amount to a representation to an agency regarding a document's veracity" is "[s]ubsumed in the elements" of the charge, namely, that the defendant "knowingly and willfully submit[ed] a false and material document to an agency on a matter that is within the jurisdiction of such agency." *Id.* The dissenting judges interpreted the majority opinion as holding that "the act of sending the documents to [the government], at [the government's] request, knowing them to be false, was, ipso facto, the criminal act." *Id.* at 1324 (Brown, J., dissenting). In this case, the court need not decide what *Steele* actually held or whether the dissent is correct because the government does not contend that Didion can be convicted solely on the basis of knowingly providing the false MSS logbook in response to the OSHA subpoena.

As the government frames the issue:

> The jury must determine if Didion selected and produced the logbook to give the appearance of compliance with OSHA's combustible dust housekeeping requirements. OSHA requested Didion's "housekeeping schedules and performance log books" and received in exchange a food safety sanitation log that had been falsified. It is for the jury to decide, based on all the facts, if Didion used the MSS logbook to give the false impression of compliance.

Dkt. 176, at 36. The question for the jury is whether, in responding to the subpoena, Didion implicitly endorsed the accuracy of the MSS logbook. If this is so, then Didion "used" the logbook by endorsing it as a representation of its industrial hygiene before the explosion.

Didion's argument shifts somewhat in its reply. Dkt. 192. Didion there argues that even if the government were to prove all the facts alleged in the indictment, Didion could not be convicted because Count 7 charges Didion only with sending the MSS logbook with falsified entries to OHSA. But paragraph 125 of the indictment alleges that Didion "willfully made and used, caused to be made and used, and aided and abetted the making and use" of the MSS logbook. The government does not press what Didion calls the "absurd" interpretation of § 1001(a)(3), under which the statute would criminalize any subpoena response that contained false information. Nor will the court adopt such an interpretation.

Didion may have a factual defense to Count 7, but it is not entitled to dismissal of Count 7 under Rul2 12(b)(3).

## B.  Motion to sever

Didion, Clark, and Lenz move to sever Count 2 so that it would be tried separately. They contend that Count 2 is not properly joined under Rule 8, and even if joinder were proper, the joinder is unfairly prejudicial to the individual defendants and thus the court should sever it under Rule 14.[2]

### 1.  Improper joinder

To support joinder, the government relies on Rule 8(b), which provides:

---

[2] Clark filed a separate motion to sever Count 2 under *Bruton v. United States*, 391 U.S. 123, 135 (1968), Dkt. 124, but he withdrew that motion in his reply brief, *see* Dkt. 172, at 10, so the court will deny it as moot. The court will grant Clark's unopposed motion to seal the co-defendant statements that Clark submitted with the *Bruton* motion, Dkt. 125.

> Joinder of Defendants. The indictment or information may charge
> 2 or more defendants if they are alleged to have participated in
> the same act or transaction, or in the same series of acts or
> transactions, constituting an offense or offenses. The defendants
> may be charged in one or more counts together or separately. All
> defendants need not be charged in each count.

Rule 8 expresses a strong preference for joinder. *United States v. Coleman*, 22 F.3d 126,

134 (7th Cir. 1994). Accordingly, district courts are to construe the joinder rules liberally to

promote judicial efficiency, limit inconvenience to witnesses and to "allow the 'total story' to

be presented to a single jury." *United States v. Carter*, 695 F.3d 690, 700 (7th Cir. 2012)

(quoting *United States v. Warner*, 498 F.3d 666, 699 (7th Cir.2007)). Whether joinder is proper

is considered on the basis of the charges in the indictment, not the expected evidence at trial.

*U.S. v. Alexander*, 135 F.3d 470, 475 (7th Cir. 1998).

The pertinent question here is whether charges arise from "the same series of acts or

transactions." Defendants contend that the offenses charged in the indictment are too varied

to arise from the same series of acts. They note particularly that only Didion is charged in

Count 2, that not all defendants are charged in the two conspiracy charges, and the accusations

of falsification relate to different record-keeping and disclosure requirements. Defendants

contend that the charges in the indictment share only a vague thematic similarity.

Defendants take an atomistic view of the indictment. The charges all relate to a core of

related facts: Didion and some of its employees failed to perform required cleaning of

accumulated dust in Didion's grain mill. The failure to manage the dust posed risks to food

safety, to the environment, and to the safety of the workplace. Defendants falsified records

purporting to document cleaning; the accumulated dust led to an explosion; and defendants

obstructed the investigation into the causes of the explosion. This is more than a vague

thematic similarity. The charges all arise from this series of closely related acts. By its terms,

21

Rule 8(b) allows different defendants to be charged in different counts, and not all defendants need to be charged in each count.

The court concludes that joinder is proper under Rule 8(b).

### 2.  Severance

Even if joinder is proper under Rule 8, the court must take care to avoid unfair prejudice that might arise from trying multiple charges and defendants together. *Coleman*, 22 F.3d at 134. Rule 14(a) allows the court to sever properly joined charges to prevent prejudice to either side:

> Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

In seeking severance, it is not enough for a defendant to show some disadvantage in a joint trial. The standard is "exacting": "The defendant must be able to show that the denial of severance 'caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him a better opportunity for an acquittal.'" *United States v. Calabrese*, 572 F.3d 362, 368 (7th Cir. 2009) (internal citations omitted). In deciding a severance motion, the court must balance the inefficiency of multiple trials against the possible prejudice to the defendant. *Id*.

Defendants' main argument for severance is that they will be prejudiced by the presentation of evidence of the explosion and deaths, which would be admitted only to prove Count 2, in which only Didion is charged. The jury would not be able to render a fair verdict to the individual defendants—none of whom are charged with causing death—after seeing

disturbing evidence of the explosion and its aftermath. The court is not persuaded for several reasons.

First, the court does not expect there to be gruesome evidence. The government will be required to show that the deaths were caused by the explosion, but that is unlikely to be sharply contested, so the court does not expect to see a lot of autopsy photos. The core contested issues for Count 2 will be whether the explosion was caused by accumulated dust, and whether that accumulation was caused by Didion's violation of the OSHA grain handling standard. The post-explosion photos may be dramatic, but they will not focus on horrific and traumatizing images of dead bodies. The court will be prepared to exclude any unnecessary upsetting evidence.

Second, defendants minimize the inefficiency of separate trials, and overstate the inefficiency of a single trial. Lenz says that "[g]iven the distinct evidentiary and legal questions between the Counts, the only savings [in a joint trial] would be in not having to select a second jury and not having a few workers testify twice that there was dust in the plant—a point that no one contests." Dkt. 141, at 32. But selecting a second jury itself may be a significant undertaking. Estimates vary, but both sides have predicted multi-week trials. And the case arises from a newsworthy event involving a well-known business. Finding 14 impartial jurors to sit through a long trial will not be easy; finding 28 will be doubly difficult and time-consuming. Contrary to Lenz's sanguine prediction about the agreement that there was dust in the plant, the extent of accumulated dust in the plant is sure to be one of the central disputes in the case pertinent not only to Count 2, but to the charges against the individual defendants.

There is certainly some evidence that will be relevant only to Count 2—specifically the expert analysis of the cause of the explosion. But the court is not persuaded that the evidence pertaining to Count 2 is so substantially separate from the evidence pertaining to the charges against the individual defendants. Evidence about the explosion will come in to explain the context for Counts 4, 5, 6, 7, 8, and 9, and the government says that the explosion is also relevant to the materiality of the misrepresentations charged against the individual defendants. The court expects to manage the trial efficiently. And despite some earlier predictions, the parties now agree that the case can be tried in three weeks. So, contrary to defendants' arguments, no attorney will have to sit by listening to weeks of evidence that has no bearing on his client.

Third, and most important, the explosion evidence is not *unfairly* prejudicial. Joinder is proper here because the charges all arise from the same series related acts, not because the crimes are of a similar nature as allowed under Rule 8(a). So this is not a case where defendants face an elevated risk of prejudice from trying unrelated but similar offenses. *See Coleman*, 22 F.3d at 134. The government charges that defendants' failure to prevent dust accumulation led to the explosion, and that defendants concealed their dust management deficiencies. Different defendants are charged with different aspects of the concealment, but there is a common core to the allegations, and the core is that defendants' dust-management practices led to the explosion and a cover-up. The explosion may be evidence of the materiality of defendants' false statements. The individual defendants, understandably, would not like the jury to know how their actions relate to the charge against Didion. But the court sees no specific unfair prejudice in the jury learning the whole story.

24

Defendants base their arguments on general, uncontroversial principles; they have not pointed to any closely analogous case in which a court found joinder to be unfairly prejudicial under Rule 14. This isn't surprising given the unusual facts of this case. But one case cited by Didion and Clark provides an informative example of a case in which joinder was proper under Rule 8, but severance under Rule 14 was required: *United States v. McRae*, 702 F.3d 806 (5th Cir. 2012). The case arose from the looting and unrest in the aftermath of Hurricane Katrina. One defendant, Warren, was a police officer who was guarding a police facility when he shot and killed Glover, purportedly in defense of the safety of the police facility. Warren was charged in two counts for violating Glover's civil rights. Other defendant police officers were charged with conspiring to cover up the shooting by, among other things, falsifying reports and burning Glover's body. Warren did not participate in the cover-up and was not charged in that conspiracy. The charges against all defendants arose from a connected series of events of which the shooting was the catalyst. The court of appeals held that joinder under Rule 8(b) was proper "[i]n light of the continuity of facts." *Id.* at 821.

But the court of appeals held that the charges against Warren should have been severed under Rule 14. The question for Warren was simply whether the shooting of Glover was justified. Warren was not charged and did not participate in the cover-up of his shooting. But the evidence of the cover-up tended to implicate Warren, because it suggested that there must have been something to hide, and thus suggested that shooting was unlawful. Furthermore, at trial the government tried to implicate Warren in the cover-up in some illegitimate ways. None of the cover-up evidence would have been admissible in a separate trial against Warren alone. The court of appeals held that Warren had shown specific and severe prejudice from the joint

trial that no jury instruction could have prevented. Warren's motion for Rule 14 severance should have been granted. *Id*. at 825–27.

Defendants here have not shown specific prejudice like that demonstrated in *McRae*. This is not a situation in which evidence about the explosions would make it appear more likely that defendants committed the crimes they are charged with or make them appear more culpable than they actually are. The evidence at issue does tend to show that defendants' alleged conduct had serious consequences, but defendants cite no authority for the view that such evidence is likely to prevent the jury from "making a reliable judgment about guilt or innocence." *Zafiro v. U.S.*, 506 U.S. 534, 539 (1993).

Defendants argue that the explosion evidence would not be admissible against the individual defendants. Given that Rule 8(b) allows different defendants to be charged separately in different counts, it is common for different counts to have different elements, and consequently that evidence that might be relevant to one count would be irrelevant to another. But the fact that some evidence in the case would be irrelevant to the charges against a specific defendant is not enough to show a specific prejudice that would prevent the jury from making a reliable determination of guilt. In this case, the explosion and death evidence does not raise a specific implication of guilt against the individual defendants the way the cover-up evidence in *McRae* did.

Defendants have shown no more than a general disadvantage from facing a single trial in which one defendant faces particularly serious charges. The jury instructions will make clear that the liability of each defendant must be considered separately, and that no individual defendant is charged with the death of any Didion employees. Carefully prepared instructions

26

will be sufficient to ensure that the jury makes a reliable determination of each defendant's guilt. The motions to sever are denied.

## C. Motions to strike

Clark seeks to strike language from Count 4, which charges a conspiracy against all defendants, and Count 9, which charges Clark with obstructing an agency.  For both motions, Clark relies on Rule 7(d), which allows the court to strike "surplusage" from the indictment. The court of appeals defines "surplusage" to mean language that is immaterial, irrelevant, or prejudicial. *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir. 1993).

### 1. Count 4

Count 4 charges all seven defendants with conspiring to conceal violations and unsafe conditions from auditors and government agencies. The count includes the following two paragraphs:

> OSHA Investigation of the Five-Fatality Explosion in 2017
>
> 67. OSHA is authorized to perform workplace inspections and investigations to carry out its mission of enforcing compliance with the OSH Act and improving workplace safety. 29 U.S.C. § 657. OSHA can issue citations and seek civil money penalties to employers for violations of the OSH Act. 29 U.S.C. §§ 658, 666. OSHA can impose higher money penalties if an employer's violation is "willful," 29 U.S.C. § 666(a), and a willful violation of a safety standard that causes death to an employee is a crime. 29 U.S.C. § 666(e).
>
> 68. From on or about June 1 until on or about November 17, 2017, OSHA investigated the May 31, 2017 explosion at DMI's Mill.

Clark seeks to strike any reference in these paragraphs to fatalities, the explosion, or OSHA's enforcement authority. Clark says that the details he identifies are irrelevant to the charges against him because those charges do not require proof of an explosion or death.

The court will deny this motion. As the court explained in the context of discussing the motion to sever Count 2, evidence about the explosion may provide context for Count 4 and may also be relevant to showing materiality of the alleged false statements. In any event, as the government points out, the court may wait until all the evidence is submitted to determine whether language in the indictment is surplusage. If the evidence shows that that details in paragraphs 67 and 68 are not relevant to the charge, Clark may renew his motion at the conclusion of the trial.

### 2. Count 9

Count 9 charges Clark with obstructing a proceeding before OSHA. Dkt. 8, ¶ 133. Clark seeks to strike a portion of paragraph 129, which states:

> During his September 29, 2017, testimony to OSHA, CLARK made deliberately false and misleading statements about, among other things: the MSS logbook, prior fires at DMI's corn mill, prior tours of the mill related to combustible dust hazards, and dust collection and housekeeping problems in the pack area.

Clark contends that the phrase "among other things" allows the government to expand the scope of the charge to include statements not listed in the indictment.

The court will deny this motion. The phrase "among other things" does not expand the scope of the charge because the charging paragraph does not limit the ways that Clark is alleged to have obstructed OSHA, and the government is not limited to the examples of alleged violations that it describes in the indictment. *See Heon Seok Lee*, 937 F.3d at 807. It is true that the government may not "prove[] facts materially different from those alleged in the indictment." *United States v. Ajayi*, 808 F.3d 1113, 1125 (7th Cir. 2015) (internal quotation marks omitted). But paragraph 129 does not support the view that the government will do that in this case. That paragraph expressly limits evidence of obstruction to false statements

28

contained in Clark's September 29, 2017, testimony. This gives Clark notice of the conduct that may be at issue in trial, so there is no unfair prejudice to Clark. *See Heon Seok Lee*, 937 F.3d at 807–08.

## D. Discovery and other procedural motions

### 1. Motion for special *Brady* disclosure and Rule 12(b)(4) disclosure

The government has produced a lot of discovery—more than 300,000 documents adding up to 1.3 million pages. The documents are in searchable electronic form in a database through which all parties have access. About three quarters of the documents are ones that the government got from Didion.

Didion asks the court to order the government to identify any material favorable to defendants of which the government is aware, which Didion contends is the government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Didion also asks the court to order the government to disclose the evidence it intends to use in its case-in-chief, which Didion contends is the government's obligation under Rule 12(b)(4). Defendants Clark and Mesner join the motion.

#### a. Request for special *Brady* disclosure

*Brady* and its progeny impose on the government a broad obligation to turn over evidence favorable to the accused, including evidence that would impeach the testimony of government witnesses. Failure to make the disclosures required by *Brady* violate the accused's constitutional right to due process. *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). To establish a *Brady* violation, a defendant would have to show that evidence was (1) favorable, (2) suppressed, and (3) material to the defense. *United States v. Johnson*, 43 F.4th 771, 783 (7th

Cir. 2022) (citations omitted). As the government points out, at this point, Didion hasn't shown any of these things.

But Didion isn't claiming that government has breached its *Brady* obligations. It's just asking for an order compelling the government to take special steps to comply with its *Brady* obligation. The basis for Didion's request is that the government's discovery production is so massive that it is effectively a suppression of exculpatory evidence by hiding that exculpatory evidence in a metaphorical haystack. So, the argument goes, the government must not only turn over the material, it must also specifically point out to the defendants any exculpatory evidence of which the government is aware.

Didion's argument would have some traction if there were evidence that the government is attempting to hide exculpatory evidence in a document dump, an unethical but time-honored practice in civil cases. Didion cites some cases in which district courts have ordered the relief it seeks, but those cases involved even larger productions, less timely productions, or some particular disadvantage to the defense. *United States v. Blankenship*, No. 5:14-CR-00244, 2015 WL 3687864, at *7 (S.D.W. Va. June 12, 2015) (four million pages, without time for defense review); *United States v. Saffarinia*, 424 F. Supp. 3d 46, 88 (D.D.C. 2020) (3.5 million pages, to be reviewed by a small defense team working pro bono); *United States v. Cutting*, No. 14-CR-00139-SI-1, 2017 WL 132403, at *10 (N.D. Cal. Jan. 12, 2017) (voluminous production marred by technical problems that impeded defense access).

But here Didion cites no evidence of the government's bad faith or any special disadvantage to the defense. In its motion, Didion cited some deficiencies in the government's production, such the lack of metadata, but those deficiencies were resolved long ago. The production was large, but it wasn't dumped on defendants at the last minute. The government

and defendants have essentially equal electronic access to the documents, three quarters of which were Didion's documents in the first place. And Didion has pointed to nothing to show that there might be exculpatory evidence in the production somewhere. The bottom line is that Didion's motion is predicated on volume alone. The court concludes that this is a case in which the general rule applies: the government has to turn over any exculpatory evidence, but it is under no obligation to do the investigative work of the defense. *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002).

### b. Rule 12(b)(4) disclosure

Didion also asks the court to order the government to disclose the evidence it intends to use in its case-in-chief. Didion contends that the disclosure is required by Rule 12(b)(4)(B), which provides:

> (4) Notice of the Government's Intent to Use Evidence.
>
> (A)   At the Government's Discretion. At the arraignment or as soon afterward as practicable, the government may notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(3)(C).
>
> (B)   At the Defendant's Request. At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

Both sides agree that the purpose of Rule 12(b)(4) is to facilitate the filing and resolutions of motion to suppress evidence, particularly by avoiding unnecessary motions aimed at evidence that the government does not intend to use. Typically, Rule 12(b)(4) requests identify specific pieces of evidence that are common subjects of suppression motions, such as items recovered during a search. The government has informed defendants that

31

> the government does not currently intend to use as evidence in its case-in-chief any evidence derived from the execution of search warrants, custodial interviews, electronic provider records, wiretaps, or similar investigative methods that often give rise to suppression motions.

Dkt. 101-5, at 3. The government's disclaimer does not obviate the government's responsibility to respond to a proper request under Rule 12(b)(4)(B), but as a practical matter, it advances the purposes of the rule by informing the defense that it does not intend to use certain categories of evidence in its case-in-chief.

Didion would press Rule 12(b)(4)(B) much further, requiring the government to disclose a trial exhibit list. Didion supports its request with one authority, *United States v. Anderson*, 416 F. Supp. 2d 110 (D.D.C. 2006), which does indeed apply the rule as Didion suggests. But the court is not persuaded that *Anderson* is a sound interpretation or application of the rule. The fulsome pretrial disclosure that Didion seeks is not expressly required anywhere in the Rules of Criminal Procedure. *Anderson's* interpretation of Rule 12(b)(4) has been widely criticized. *United States v. DeLeon*, 428 F. Supp. 3d 698, 715 (D.N.M. 2019), provides a careful discussion and reaches a well-reasoned conclusion: Rule 12(b)(4)(B) requires the government to disclose whether it intends to use evidence *specifically identified in a request by the defendant* in its case-in-chief. *DeLeon's* approach is consistent with the text and the purpose of Rule 12(b)(4), and it fits comfortably within the overall structure of the Rules of Criminal Procedure, which do not require the government to reveal its trial strategy.

### 2. Motion for disclosure of grand jury materials related to Count 3

Defendant Clark asks the court to order the government to disclose materials related to the now-dismissed Count 3 and the government's instruction to the grand jury on several counts. Didion joins Clark's motion and expands the scope of the requested disclosure.

The proceedings of the grand jury are entitled to a presumption of regularity, and the secrecy of these proceedings is not to be breached lightly. *United States v. Lisinski*, 728 F.2d 887, 893 (7th Cir. 1984). Rule 6(e)(3)(C) allows the disclosure of grand jury proceedings only on a showing of "compelling necessity" or "particularized need." *Id*.

### a.  The Count 3 materials

Count 3 charged Didion with a willful violation of an OHSA regulation causing death. The count was premised on the theory that a deflagration started in the Coarse Grinder Filter in the baghouse, which lacked the OSHA-required explosion venting or explosion suppression system. But the government dismissed Count 3 soon after the indictment was returned because the government's explosion expert, John Cholin, had determined that the Coarse Grinder Filter had been taken out of service two days before the explosion, and thus it could not be the origin.

Clark and Didion infer that the government must have presented evidence to the grand jury that the Course Grind Filter was the origin of the explosion, and that evidence has now been rebutted. From this they infer further that the government's original evidence would cast doubt on its current theory of the origin of the explosion, and perhaps even suggest that the government knowingly presented false evidence to the grand jury. So Clark and Didion contend that all the Count 3 material is potentially exculpatory and thus the government is obligated to disclose it under *Brady* or *Giglio*. They ask the court to order the government to turn over essentially all the evidence and the grand jury testimony related to Count 3. Clark also invokes Rule 16(a)(1)(F) to request any expert reports setting forth alternative theories of the cause and origin of the explosion.

The government says that it has fully explained the reasons it dismissed Count 3 by disclosing the Cholin report, which identifies all the evidence that he relied on, and all of that

evidence has been provided to defendants in discovery. The government resists turning over its original Count 3 evidence for three reasons. First, the government contends that evidence related to a dismissed count cannot be material. Second, the government says that some of the material is entitled to work product protection. And third, Didion and Clark have not shown the compelling need required to surmount the presumption of secrecy that attaches to grand jury proceedings. The government offers to provide the materials for in camera review.

The court is not persuaded that Clark and Didion have shown a compelling need for the disclosure of the Count 3 material. An explosion is a complicated phenomenon, and determining its cause and origin is not a simple matter. Just because the government is now satisfied that the Cholin report rules out the Coarse Grind Filter as the source does not mean that the government presented any false evidence to the grand jury, let alone knowingly so. Nor does it necessarily mean that any of the evidence is exculpatory or that it would impeach the government's witnesses. So the court is not ready to pull the veil from the grand jury's work and order disclosure under *Brady* or *Giglio*.

But it is not unreasonable for Clark and Didion to infer that there is some conflict in the Count 3 evidence, and that some of the conflicting evidence might be helpful to them. To protect the secrecy of the grand jury, and to protect against any unwarranted intrusion on the government's work product privilege, the court will order the government to provide the Count 3 materials for in camera review along with any other undisclosed reports of government investigation of the explosion.

### b.  The grand jury instructions

Clark requests the grand jury instructions for Counts 2, 4, 7, and 9. Didion adds a request for the instructions on Count 1. The basis for the requests is that these counts are

34

defective because they fail to state an offense or are ambiguous, and thus the government may have mis-instructed the grand jury. An improper instruction would be a basis for dismissal and a basis for the disclosure or court review of those instructions. But Clark and Didion base their disclosure request solely on their argument that the counts at issue were legally deficient.

So, under these circumstances, defendants could achieve their objectives by directly challenging the sufficiency of those counts of the indictment, and they have done so. As explained elsewhere in this opinion, the court has considered defendants' arguments and found them lacking. The court is not persuaded that Clark and Didion have made the showing necessary to require disclosure of the government's instructions to the jury.

### 3.  Motion for a bill of particulars

Defendants Didion, Clark, and Lenz have each moved for a bill of particulars seeking several categories of information.  A bill of particulars is generally unnecessary if the indictment is legally sufficient, especially in the case of a detailed "speaking" indictment such as the one here. *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003). Rule 7 allows the court to order a bill of particulars if the defendant lacks information necessary to prepare a defense. But the defendant is entitled only to the theory of the government's case, not an itemization of the government's evidence. *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2008).  The court will deny the motions for bills of particulars, with one exception.

First the denials. Didion asks the court to order the government to identify the specific false entries in the MSS logbook and Lenz makes the same request concerning the baghouse logbook. These requests will be denied because the indictment charges defendants with systematically falsifying the logbooks over several years. Identifying all the specific entries that are false, among the many thousands of entries, would be a makework exercise that is

unnecessary under the facts of this case. And, in any case, defendants are in as good a position as the government to identify the false entries.

Didion asks the court to order the government to identify the victims of the fraud conspiracy in Count 1. The court will deny this request because the indictment adequately identifies the victim class: food and beverage manufacturers who purchased milled corn from Didion relying on Didion's representations about Didion's sanitation process. The identity of a specific victim is immaterial to the fraud charges. *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010). And again, the identity of Didion's food and beverage customers can be readily ascertained by Didion.

Lenz asks the court to order the government to identify when Lenz joined and withdrew from the conspiracy. When Lenz joined the conspiracy is immaterial, so long as the government proved that he joined it at some point. *United States v. Arrellano*, 757 F.3d 623, 634 (7th Cir. 2014). When Lenz withdrew is an affirmative defense that would require Lenz to prove that he took an affirmative act to disavow the conspiracy. *Smith v. United States*, 568 U.S. 106, 114 (2013). Lenz's putative withdrawal is a matter within his knowledge, not the government's.

Now the exception. Lenz asks the court to order the government to disclose the unindicted coconspirators. The government contends that defendants do not have a general need to know the identity of all the individuals who may have been involved in their deceptive conduct over the years. But Lenz isn't asking for anything quite that broad. If he were, the court would allow the government to simply point to the discovery, which identifies the potential witnesses and their statements. Lenz asks for the identity only of the individuals that the government will contend are coconspirators. The government is correct that the

36

government will not have to prove that Lenz knew or conspired with all of the members of the conspiracy.

It's not fair to describe the disclosure of coconspirators as general rule in this district, as Lenz suggests. Dkt. 195, at 20. But the inclination against bills of particulars softens somewhat in this area. *See United States v. Young*, No. 98 CR 91, 2005 WL 2100975, at *1 (W.D. Wis. Aug. 30, 2005). But given the number of potential witnesses in this case, 175 according to Lenz, the identity of the coconspirators is reasonably necessary for the preparation of a defense. The court will order the prompt disclosure of the names of the individuals who the government believes are coconspirators. The disclosure is to be based on the government's current knowledge, to be promptly supplemented if that knowledge changes. The disclosure must be complete and final by the deadline for the government's pretrial disclosures, July 7.

### 4. Motion for identification of coconspirator statements

Lenz asks for a *Santiago* proffer in which the government identifies all the statements of coconspirators it intends to admit, called a *Santiago* proffer. *See United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir. 1978). The court will deny this request as unnecessary, because by July 7, the government will have to disclose its notice and intent to offer, among other things, "any statement by a defendant offered under Rule 801(d)(2)(C)–(E)." Dkt. 153, at 2. But the court will provide the clarification that Lenz requests: the scheduling order requires the government to disclose, with reasonable specificity, a comprehensive list of all statements by co-conspirators to be offered under Rule 801(d)(2)(E).

ORDER

IT IS ORDERED that:

37

1. Didion Milling's motion to require the government "to identify known *Brady* material and to comply with Federal Rules of Criminal Procedure 12(b)(4), 16(a)(1)(G), and 12.4(a)(2)," Dkt. 101, is DENIED.

2. Clark's motion to sever Count 2, Dkt. 119, is DENIED.

3. Clark's motion for a bill of particulars, Dkt. 120, is DENIED.

4. Clark's motion to dismiss Counts 4, 7, and 9, Dkt. 121, is DENIED.

5. Clark's motion to strike the phrase "among other things" from paragraph 129 of the indictment, Dkt. 122, is DENIED.

6. Clark's motion to strike language from Count 4, Dkt. 123, is DENIED.

7. Clark's motion to sever his charges from the other defendants, Dkt. 124, is DENIED as moot because Clark withdrew the motion.

8. Clark's motion to seal exhibits in support of his motion to sever, Dkt. 125, is GRANTED.

9. Didion's motion to dismiss, for a bill of particulars, and to sever Count 2, Dkt. 127, is DENIED.

10. Hess's motion to dismiss Count 7, Dkt. 134, is DENIED.

11. Hess motion to dismiss Count 8, Dkt. 135, is DENIED.

12. Lenz's motion to sever Count 2, Dkt. 136, is DENIED.

13. Lenz's motion to dismiss Count 6, Dkt. 137, is DENIED.

14. Lenz's motion to dismiss Count 4, Dkt. 138, is DENIED.

15. Lenz's motion for a bill of particulars, Dkt. 139, is GRANTED in part and DENIED in part. No later than June 1, the government must disclose the names of the individuals who the government believes are coconspirators. The disclosure is to be based on the government's current knowledge, to be promptly supplemented if that knowledge changes, and must be complete and find by July 7. The motion is denied in all other respects.

16. Lenz's motion to compel the government to identify coconspirator statements, Dkt. 140, is DENIED, as unnecessary. The scheduling order already requires the government to disclose, with reasonable specificity, a comprehensive list of all statements by co-conspirators to be offered under Rule 801(d)(2)(E).

17. Clark and Didion's motions for disclosure of grand-jury materials and "*Brady* materials" related to Count 3, Dkt. 202 and Dkt. 210, are GRANTED in part and

DENIED in part. The government is directed, by June 1, to submit to the court for in camera review the grand jury testimony, any other evidence related to Count 3 that was submitted to the grand jury, and any reports that the government relied on related to Count 3. The motions are denied in all other respects.

Entered May 11, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge