IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA

     v.                             Case No. 22-cr-55-jdp

DERRICK CLARK

       Defendant.

---

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum to aid the Court in sentencing defendant Derrick Clark. The jury convicted Clark of Count 4 (conspiracy to commit false entry and obstruction offenses), Count 5 (false environmental compliance certification), Count 6 (falsified baghouse logs), and Count 9 (obstruction of OSHA investigation). For the reasons below, the government requests that the Court sentence Clark to 60 months of incarceration.

<u>Factual Issue Related to Involvement in Concealing Sanitation Problems</u>

The government is not providing a factual overview due to the Court's familiarity with the record and facts and the government's prior filings regarding guidelines calculations, Dkt. 555, and the USSG §3B1.1 enhancement. Dkt. 604-1.

However, Clark raises a factual issue that merits discussion. He objects to treating his conviction under Count 4 for guidelines purposes as including a conviction for conspiring to falsify records within the jurisdiction of OSHA, in violation of 18 U.S.C. 1001(a)(3). Dkt. 576 at 3-5. Clark claims that both

1

instructional error and the sufficiency of the evidence preclude a finding that Clark conspired to falsify OSHA records for guidelines purposes.

As a threshold point, the resolution of Clark's objection will not affect the Guidelines calculations, at least under the grouping assumptions set forth in the PSR. The PSR groups OSHA-related offenses together, including the pre-explosion falsification of the MSS log (Count 4) and the post-explosion obstruction of OSHA's investigation (Count 9). Under that approach, Clark's objection would make no difference because the offense group for OSHA offenses (Group A) has a lower offense level than does the offense group for environmental offenses (Group B).

However, Clark's argument is addressed below if the Court takes a different guidelines approach and for the independent reason that Clark's involvement in covering up Didion's sanitation failures, including falsifying the MSS log, is relevant to the § 3553(a) factors. Clark characterizes his acquittal on Count 1 as proof that there was insufficient evidence to show beyond a reasonable doubt that he conspired to falsify the MSS log. Dkt. 576 at 4. Such assumptions about the reasons for an inconsistent verdict are unreliable. *United States v. Pisman*, 443 F.3d 912, 915 (7th Cir. 2006) (the decision to acquit may result from juror mistake, compromise, or lenity). In any case, evidence about Clark's involvement in covering up Didion's sanitation failures can be considered by the Court at sentencing if the facts are found by a preponderance of the evidence, *United States v. Carnell*, 972

F.3d 932, 938 (7th Cir. 2020), even assuming it was acquitted conduct. *United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2020); 18 U.S.C. § 3661.[1]

Clark's factual argument is that "at best," it "could arguably be said" that the evidence reflects that Clark "may have been aware of others' criminal conduct" and that he was "merely present when others committed criminal conduct" without evidence of "active participation in such conduct." Dkt. 576 at 4. Clark is correct to concede that he was aware of others' criminal conduct, and that he knew from personal involvement in audits how the false records were being used to obtain favorable audit results.[2] In addition to the other evidence, he was copied to numerous superintendent group emails from Mesner about the gaps in the MSS log

---

[1]  Clark's objection to the jury instructions has no effect in a sentencing proceeding. Dkt. 576 at 3. In any case, Clark is wrong because the jury received adequate instructions on the elements of 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 1519. Dkt. 504 at 15, 18-19. The Count 4 instructions told the jury that the elements of those offenses were "set out below in the instructions for Count 5 through 9," and they were. Dkt. 504 at 12. Clark did not object to the instructions at trial, as required to preserve the claim of error and avoid plain error review. Fed. R. Crim. P. 30(d); *United States v. Leal*, 72 F.4th 262, 265-66 (7th Cir. 2023).

[2]  As stated in the earlier filing, Dkt. 555 (citing record evidence) Clark was the de facto mill manager for one year between Spring 2016 and Spring 2017 as that position was vacant. He regularly received emails among Mesner and the superintendents about Didion's failure to follow the sanitation schedule and the perceived need to "complete" the book in advance of audits, Dkt. 555 at 5 (citing emails from Mesner and others), participated in numerous mill superintendent meetings where the topics were frequently discussed, *id.* at 4-5 (citing testimony), and represented Didion during food safety audits when the completed book was reviewed and knew why the book was being backfilled. Dkt 526 at 84-88 (summary agent testimony referencing exhibits). He understood that Didion's food safety certification auditors (FSSC auditors) and private purchaser auditors (*e.g.* General Mills and Anheuser-Busch) reviewed the cleaning logs, and he was there when they did it. *E.g.* Dkt. 526 at 87-88 (summary testimony); Ex. 1326; Ex. 1327 (notes from June 2016 FSSC audit); Dkt. 525 at 134 (Anheuser-Busch auditor testimony).

and the need to fill them in before audits. Dkt. 555 at 5 (citing Ex. 158, Ex. 160, Ex.
167, Ex. 170, Ex. 154a, Ex. 171). Clark was also at a superintendents meeting one
week before the annual FSSC audit in 2016 and made a note during a discussion by
the Quality Department (Mesner's department) that said "Master Sanitation
Schedules – Need to get completed ASAP." Ex. 1320.

The Court is not required to accept Clark's argument that he sat idly by as
the shift superintendents and sanitation department managers copied him to
emails or discussed at pre-audit meetings the need to backfill the MSS log before
audits. If Clark felt the need to write a note in his personal notes from the
superintendent meeting that the MSS log "needs to get completed ASAP," at least a
preponderance of the evidence supports the inference that he conveyed that view to
attendees so that Didion would pass the audit and retain its certification. And even
assuming Clark said nothing, his presence at conspiratorial discussions must be
viewed in the context of business meetings between employees of the same
organization, which is a "far cry from the typical 'mere presence' case in which the
alleged conspirator has no demonstrated stake in the conspiracy and contributes
nothing to its success." *United States v. Green*, 735 F.2d 1018, 1025 (7th Cir. 1984).
Each of the meeting participants was Clark's subordinate and, given his role as vice
president and mill manager, his (assumed) silence during discussions about the
continued plan to backfill the log before audits was tacit approval. *See Conley*, 875
F.3d at 399 (observing in the context of a sufficiency of the evidence supporting a
trial conviction that, "when acts in furtherance of the conspiracy were committed, a

defendant's presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy, is sufficient to establish the participatory link").[3]

Clark's role in Didion's efforts to conceal its sanitation problems from outsiders and falsify its sanitation log may be considered by the Court, including in its consideration of the § 3553(a) factors.

Sentencing Guidelines Calculations

*Substantial Interference with the Administration of Justice*

Clark contests the three-level "substantial interference with the administration of justice" enhancement under USSG §2J1.2(b)(2), which the PSR applied to Count 9 (Offense Group A, the OSHA group) and Count 5 (Group B, the environmental group). Dkt. 576 at 5-10. "Substantial interference with the administration of justice" "includes" a "premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." USSG §2J1.2 app. n 1. Because the term "includes" is not exhaustive, USSG §1B1.1 cmt. 2, substantial

---

[3] Given the nature of conspiracies, "a tacit agreement may support a conviction" and the agreement "may be proved by circumstantial evidence" such as evidence the "co-conspirators embraced the criminal objective of the conspiracy, the conspiracy continued onward towards its common goal, there were prolonged and/or cooperative relationships, or the various transactions followed a similar sequence of events." *United States v. Griffin*, 76 F.4th 724, 742 (7th Cir. 2023).

interference is "not limited to the examples set out in the guidelines." *United States v. Newman*, 614 F.3d 1232, 1236-37 (11th Cir. 2010) (citations omitted).

The PSR correctly indicates that both Count 9 and Count 5 resulted in substantial interference due to the "unnecessary expenditure of governmental or court resources." Clark's opposition is based on the legally erroneous position that the enhancement only applies if the government "expend[ed] resources distinct from and in addition to the underlying investigation of the defendant's crime." Dkt. 576 at 9. Clark relies on the unreported opinion in *United States v. Hayes*, 358 Fed. Appx. 685 (7th Cir. 2009), but that opinion contradicts his position:

> [W]e have discussed the application of the [substantial interference] guideline in several obstruction-of-justice cases. And in that context we have not distinguished between the resources expended in the investigation and prosecution of the defendant's offense and any other expenses necessary to address the additional consequences of that offense. Instead, we have approved the application of the upward adjustment where the district court based its findings, at least in part, on expenditures that were arguably necessary to the investigation and prosecution of the underlying crime.

358 Fed.Appx. at 691.

The reported cases discussed in *Hayes* further refute Clark's argument that resources must be expended for reasons "distinct from and in addition to the underlying investigation of the defendant's crime." In *United States v. Tankersley*, the adjustment was affirmed because defendant's false conduct constituting contempt of court caused the government to devote "many weeks of work" to "tracking down and determining [the truth of] what happened." 296 F.3d 620, 623 (7th Cir. 2002). In *United States v. Bradach*, the initial perjury impaired grand

jury proceedings and necessitated four perjury-related trials, including the defendant's own trials. 949 F.2d 1461 (7th Cir. 1991). Perhaps most analogous is *United States v. Lueddeke*, 908 F.2d 230 (7th Cir. 1990), where the initial perjury caused two agents to spend one calendar week investigating the testimony to determine its falsity. The perjury resulted in the "unnecessary expenditure of substantial government resources" under §2J1.2(b)(2) because the government spent "a full two weeks trying to sort out the truth." *Id.* at 234.

The government devoted far more than two weeks to reviewing the paper trail, interviewing witnesses, and consulting experts to uncover Clark's crimes.[4]

Clark warns that applying the substantial interference adjustment here would require courts to automatically apply the enhancement "for all obstruction offenses." Dkt. 576 at 10. But there are obstructive statements that require substantial investigation to determine their falsity and others that do not. *Cf. United States v. Lupton*, 620 F.3d 790, 806-07 (7th Cir. 2010) (material false statements are crimes as long as they are "aimed at misdirecting agents and their investigation" even if "they miss spectacularly or stand absolutely no chance of succeeding"). The USSG §2J1.2(b)(2) enhancement does not apply when no investigation is needed to sort out the truth. *See United States v. Jones*, 900 F.2d

---

[4]     The government's previous submission outlines the investigative efforts required for the government to learn the truth about Didion's cleaning, environmental, and explosion prevention issues—all of which were topics addressed in Clark's OSHA testimony and environmental compliance certifications. Dkt. 555 at 5-7 (resources investigating OSHA-related issues); 11-12 (resources investigating environmental issues). The government spent over 1,000 hours reviewing documents in this case prior to indictment.

512 (2d Cir. 1990) (adjustment did not apply where another person had already provided the government with the information that the defendant had concealed). By contrast, the administrative agencies receiving Clark's false compliance certifications or hearing his false testimony could not have known those statements were false; it took an extended criminal grand jury investigation to get at the truth, so USSG §2J1.2(b)(2) applies. *See United States v. O'Neill*, 116 F.3d 245, 250 (7th Cir. 1997) ("Regardless of whether the government was seeking new facts or verification of facts it already possessed, O'Neill's lies forced the government to look elsewhere for the information it sought, thereby expending additional resources" to corroborate facts that O'Neill falsely denied).

Clark next suggests that the USSG §2J1.2(b)(2) enhancement cannot apply unless the government first "attempts to interview" the defendant, apparently based on the idea that a witness who has already lied may come clean if reapproached by the government before the government has spent the resources needed to understand if the initial statement was false. Dkt. 576 at 6, 10. There is no basis in the law for Clark's position. Clark knew that he had not told the truth to the administrative agencies. If he wished to set the record straight about what he knew as Vice President of Operations about Didion's safety and environmental compliance, he could have approached OSHA and DNR, and if he had done so early enough, before the government devoted substantial resources to criminally

investigating his conduct, he would not now be facing a substantial interference enhancement.  Clark left his statements uncorrected.[5]

Finally, Clark's says that his false compliance certifications could not have led to the expenditure of substantial government resources because, if anything, his misconduct *saved* governmental resources by withholding from the DNR the information on which it could have opened a civil or criminal investigation.  Dkt. 576 at 5 ("Clark's conduct *precluded* expending resources in an enforcement action.") (emphasis in original).  Clark's argument is both unsympathetic and legally wrong, since the §2J1.2(b)(2) enhancement applies not only when the government expends substantial resources unnecessarily but also where the obstructive acts led to unjust outcomes, including improperly terminated investigations.  USSG § 2J1.2 app. n.1.

*Extensiveness of Offense Under USSG §2J1.2(b)(3)*

Clark contests the two-level increase for Count 5 under USSG §2J1.2(b)(3) for offenses that "(A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative records, document, or tangible object to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation."  Clark's argument is to minimize the significance and scope of his offense.

---

[5]     A defendant's refusal to assist authorities in the investigation of other persons may not be considered as an aggravating sentencing factor, USSG §5K1.2, but here the government is responding to Clark's affirmative argument.

First, he says that other Didion officials were listed as "responsible officials" on Didion's environmental permit. But Clark signed the compliance certifications covering the years 2015, 2016, and 2017, as the "responsible official" and made the attestation of truth, accuracy, and completeness. Dkt. 576 at 11.[6]

Second, Clark suggests that mill baghouse pressure drop requirements were a small part of Didion's permit easily lost among "hundreds of permit monitoring requirements." Dkt. 576 at 11, 12. That is not so. Dan Ketter, Didion's environmental manager between 2008 and 2011, testified that the baghouse recordkeeping requirements were a "major part" of the environmental manager's job at Didion "because of the number of baghouses that were in operation at Didion both in the mill side and the ethanol side." Dkt. 518 at 152. The significance of the baghouse monitoring requirements is also reflected in the permit itself. The mill baghouse pressure drop log sheet used by Didion was mandated by pressure drop reading requirements found throughout the permit, not in a single isolated provision. Taking for example the 2014 version of the permit referenced in Clark's submission, pressure drop requirements for mill baghouses are found on pages 85-86 (Truck/Rail Unload), 87-89 (Mill Truck Bulk Loadout Filter), 90-91 (South Filters), 92-93 (North Filters), 94-96 (hammermills and A and C Mill processes),

---

[6]     A responsible official's compliance certification is an "essential or especially probative record" for purposes of the USSG §2J1.2(b)(3) enhancement, which Clark does not dispute. *See United States v. Mathews*, 874 F.3d 698, 703 (11th Cir. 2017) (falsifying a medical treatment record that, if filled out truthfully, would have revealed that a patient was given unacceptable care).

103-105 (Grain Milling), 106-107 (Grinding Filter), and 126-128 (Malfunction Prevention and Abatement Plan for baghouse issues). Ex. 706d (permit).[7]

Third, Clark touts that the compliance certifications disclosed "some deviations to the DNR," and "Didion never represented itself as perfect." Dkt. 576 at 15 (emphasis in original). That argument is unconvincing given what was not reported: that the company had routinely faked its mill baghouse logs until at least mid-March 2017. If anything, the inclusion of some deviations made Clark's false conduct more likely to deceive regulators given the size of the Didion facility. The Didion air permit covered the entire Cambria facility, which included a raw corn receiving and processing facility, a corn mill, an ethanol plant, and a dried distillers grains and solubles (DDGS) processing and loadout facility. The standardized compliance certification form allowed responsible officials to certify that a facility was in either "continuous compliance" or "intermittent compliance." Ex. 822 at 1. An assertion that a facility of Didion's size was in "continuous compliance" with all permit obligations without any deviations over a six-month or one-year period—an assertion of perfection—might itself raise questions from regulators.

Finally, Clark minimizes the scope of the falsification scheme that he concealed through the false certifications, stating that if 2,500 readings were falsified between 2014 and 2017, they would represent only 5% of the estimated

---

[7]     Clark fails to acknowledge that it was not only the baghouse requirements in the permit that were being violated. He also concealed violations of the requirements for minimum scrubber water flows, Ex. 706d at 2-3, 7, 9 and the operating temperatures on the RTO, *id.* at 3-5, 7, 9, 11-12, 15-16, 20-22.

50,000 readings taken during that period.  Dkt. 576 at 12.  For USSG §2J1.2(b)(3) to apply, it must be shown that an offense "involved the … fabrication of a substantial number of records."  2,500 false readings is a "substantial number" of false records.[8]

In sum, Clark repeatedly falsified an "essential or especially probative document" to conceal the "fabrication of a substantial number of records."  His environmental offense was extensive in scope under USSG §2J1.2(b)(3).

*Two-Level Reduction for Zero-Point Offenders*

Clark maintains that he qualifies for the two-level decrease for "zero-point offenders" who received no criminal history points under Chapter 4.  USSG §4C1.1. However, a defendant does not qualify for the reduction if he played an aggravating role in the offense and received an upward adjustment under USSG §3B1.1.  For the reasons stated in the government's earlier objection, Dkt. 604-1, Clark was a "manager" and "supervisor" of Winch for the purposes of the Count 5 offense and should receive a two-level increase per USSG §3B1.1(c).

That said, the government respectfully differs with the PSR that the offenses on which Clark's guidelines range is calculated—Count 9 (for Group A) and Count 5 (for Group B)—"resulted in" death or serious bodily injury, which is the specified

---

[8]    There are thousands of serial "2" and "8" entries in the logs since 2012, as explained in the government's December filing.  Dkt. 555 at 9 (citing baghouse logs in the record).  The baghouse log entries for the dry grit filter—a large baghouse that collected dust from numerous milling systems, Ex. 592b at 5-6 (schematics)— are particularly egregious examples.  Almost every reading from June 1, 2015, until March 4, 2017—a period covering approximately 1,980 readings (assuming three readings a day, 30 days per month, over 22 months)—was exactly "2" inches of water gauge.  *See* Ex. 733b (2015 log), Ex. 746 (2016 log), Ex. 840i (2017 log).

disqualifying aggravating factor at USSG § 4C1.1(a)(4).  Environmental offenses and false testimony after the explosion did not cause the injuries.

*Total Offense Level*

Because of the government's late objection, the PSR does not reflect the upward adjustment for Clark's aggravating role under USSG §3B1.1(c).  When that two-level adjustment is added, the adjusted offense level for Group B should be 23 instead of 21.  That increase, in turn, affects the application of the multiple count adjustment because the difference in the adjusted offense levels between Groups A and B would be more than four levels, which would result in a total of 1.5 units instead of two units.  Under USSG §3D1.4, the greater of Clark's adjusted offense levels (23) would be increased an additional level.  Thus, Clark's total offense level is 24 with an advisory range of imprisonment of 51 to 63 months.

Section 3553 Factors

In imposing sentence, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the statutory federal sentencing purposes. 18 U.S.C. § 3553(a).  The Section 3553(a) factors support a 60-month sentence.

1.  Nature and Circumstances of the Offense

The government considers Clark's offenses to fall into three general categories of conduct, each of them serious.

First, Clark conspired to conceal the truth about Didion's sanitation and cleaning practices, which were relevant to both food safety and explosion prevention.  As vice president of operations and acting mill manager, Clark knew

13

about the engineering, manpower, and operational issues that caused systemic sanitation problems at Didion; and he knew that false entries were routinely made in the sanitation log before audits to deceive auditors. Instead of using his authority to stop or oppose the dishonest practices, Clark participated in them. Falsifying compliance records is a serious offense that misleads auditors, conceals OSHA violations, perpetuates unsafe conditions, unfairly rewards companies that cut corners, and disadvantages competitors who do what is needed to comply.

Second, Clark concealed the widespread environmental violations at Didion. As the company's certifying "responsible official," he abused an important role under the Clean Air Act. False compliance certifications frustrate the administration of the regulatory program, especially when the violations being concealed are extensive, longstanding, and themselves involve dishonesty. Clark's conduct was intended to ward off regulatory scrutiny of a troubled company, and it took extraordinary effort for the government to uncover the criminal conduct here.

Third, Clark obstructed OSHA's investigation by making false and misleading statements during sworn testimony after a five-fatality workplace disaster. Importantly, Clark not only knew about the unsafe conditions, but he knew who else knew within Didion's executive structure knew about the issues. Even so, he falsely denied that capital expenditure projects that he proposed to the highest levels of the company—and which had not been acted on—had anything to do with explosion prevention and protection. Providing false testimony that misleads investigators about the knowledge of safety issues after a fatality is a

grave offense. OSHA is owed truthful testimony in its investigations, but never more so when the workplace (and the evidence in it) has been destroyed and workers have been killed. OSHA must receive accurate information in fatality cases, not only to enforce the OSH Act, but to understand what conditions and practices resulted in death so that future such fatalities can be prevented.

Clark opted to protect the company, himself, and the company's leadership instead of telling OSHA the truth. *Cf. Lueddeke*, 908 F.2d at 233 (perjury and obstruction of justice offenses are "very serious" and "especially insidious" because they "decrease the ability of the courts and grand juries to get at the truth and weed out illegality"). It was only through extraordinary effort that the government got at the truth in this case, and a lengthy sentence is warranted to punish the effort to cover up corporate knowledge and suppress the truth about a workplace disaster.

2.  Underline: History and Characteristics of the Defendant

Based on the information available to it at the time of this filing, the government agrees with the PSR that there does not appear to be specific offender characteristics that would support a departure. Clark's lack of a criminal history is reflected in his Category I designation, while his managerial and supervisory position relative to the criminal conduct properly disqualifies him from the zero-point offender reduction. Clark has not accepted responsibility for his actions.

3.  Need for General Deterrence and to Promote Respect for the Law

A lengthy term of imprisonment is required to promote respect for the law and to deter corporate officers from committing these kinds of crimes. As the

Seventh Circuit recently observed, "general deterrence is, after all, an economic theory of punishment: 'Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.'" *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) (quoting *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008)). That remains true even if the specific defendant is unlikely to reoffend. "The Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citing legislative history).

As to Clark's involvement in concealing Didion's sanitation problems from auditors and outsiders, a strong sentence is needed so that other corporate officers understand that any economic benefit to be derived from false business practices and falsified compliance records is not worth the personal risk of a lengthy jail sentence. Clark joined the conspiracy to mislead outsiders about Didion's cleaning practices so that Didion could keep selling products and make money. A strong sentence is warranted to deter business crimes that earn revenue through deceit.

As to Clark's environmental offenses, it is necessary to send a strong message to other "responsible officials" that signing false Clean Air Act compliance certifications is not worth the risk of jail. The incentives to committing environmental crimes are high. By cutting corners on compliance businesses can save substantial money, and by filing false compliance certifications they can avoid

government scrutiny and enforcement.  Where the business benefit derived from misconduct is high, so must be the associated sentences.  *Arroyo*, 75 F.4th at 708.

Clark's obstruction of OSHA's fatality investigation demands a lengthy term of incarceration to deter corporate officers from concealing the facts even (and especially) when the stakes to companies are at their highest, such as after a workplace disaster.  A corporation and its officers may execute legitimate "crisis management" strategies, like public relations and legal responses, within the bounds of the law.  But the corporate interest in "damage control" and limiting the flow of information about wrongdoing does not permit law breaking.  Clark knew that, depending on what information was disclosed during OSHA's interviews, the the reputational, business, and legal fallout could severely harm the company.  The incentive to obstruct is high, and the Court must send a message to corporate officers that impeding the fact-finding of important federal agency investigations will be severely punished.

4.  Sentencing Guidelines and Policy Statements

The government's recommendation of 60 months of incarceration is within the guidelines range.  No policy statements suggest a departure is warranted.

5.  Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires judges to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  However, avoidance of unwarranted disparities is considered by the Sentencing Guidelines themselves—the Guidelines factor the

seriousness of the offense, relative culpability, criminal history, and personal characteristics. *Gall v. United States*, 552 U.S. 38, 54 (2007). Therefore, when a district court correctly calculates and carefully reviews the Guidelines range, it "necessarily gives significant weight and consideration to the need to avoid unwarranted disparities." *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). The government's sentencing recommendation is within the guideline range.

The government's recommendation of incarceration for Clark is higher than any other defendant in this case, but that is as required. The need to avoid unwarranted disparities includes "the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated." *Gall*, 552 U.S. at 55 (emphasis in original). Unlike others, Clark's misconduct encompasses all aspects of this case: pre-explosion crimes of dishonesty, environmental crimes of dishonesty, and obstruction of OSHA's investigation.

Clark was more culpable. As Vice President of Operations he had greater authority to intervene and oppose false conduct, but he instead joined it. He relied on subordinates to carry out criminal conduct, and he abused his position of trust under the environmental law. By virtue of his position as Didion's Vice President, he also knew more (and concealed more) about the corporation's awareness of its own safety failings before the explosion.

Unlike others, Clark has not accepted responsibility and did not cooperate. *See United States v. Fitzpatrick*, 32 F.4th 644, 652 (7th Cir. 2022) ("Notably, a sentencing difference is not a forbidden 'disparity' if it is justified by legitimate

considerations, such as rewards for cooperation" like "cooperat[ing] and cut[ting] a deal"). He is not similarly situated to any other defendant in this case.

6. <u>The Need to Provide Restitution and the Sentences Available</u>

The government does not believe that restitution is authorized as it relates to Clark because the victims of the May 2017 explosion cannot be said to be "victims" of Clark's offenses under the restitution statute.

A court "may order restitution only if there is a statutory basis to do so." *United States v. Kieffer*, 794 F.3d 850, 853 (7th Cir. 2015) (citations omitted). Although both the supervised release and probation statutes describe a court's authority to issue restitution to victims, the law of the Seventh Circuit limits that authority to cases where the recipients of the restitution would be "victims" as defined by the restitution statutes at 18 U.S.C. §§ 3663 & 3663A. *Id.* The restitution statute provides:

> For the purposes of this section, the term "victim" means any person directly or proximately harmed as a result of the commission of the offense for which restitution may be ordered including, in the case of an offense that involves as an element of a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2). "Direct and proximate harm means that the loss would not have occurred 'but for' the offense and that it was 'foreseeable.'" *United States v. Clark*, 787 F.3d 451, 463 (7th Cir. 2015). Clark's environmental and post-explosion obstruction of justice offenses did not cause the deaths and injuries in this case.

The only offense for which restitution could arguably be provided is the conspiracy to falsify the cleaning records within OSHA's jurisdiction, but the

argument is not persuasive on these facts. The MSS logs were not provided to OSHA before the explosion, so OSHA never detrimentally relied on the false statements as required to show that a Section 1001 false statement to an agency caused harm to a victim. *See Clark*, 787 F.3d at 464 (submitting false certifications of compliance with prevailing wage requirements during and prior to underpaying workers was sufficient to give the workers "victim" status because the submission of false records influenced the agency and prevented its intervention). In addition, substantial restitution was ordered to be paid by defendant Didion Milling.

Conclusion

The government respectfully requests that the Court sentence Clark to 60 months of imprisonment.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Env't and Natural Resources Div.
U.S. Department of Justice

By: /s/ Samuel Charles Lord
Samuel Charles Lord
Trial Attorney

Richard J. Powers
Senior Trial Attorney
Joel LaBissonniere
Trial Attorney

Environmental Crimes Section
U.S. Department of Justice
4 Constitution Square
150 M Street
Suite 2.900
(202) 305-0328

CERTIFICATE OF SERVICE

I certify that on February 8, 2024, I caused the GOVERNMENT'S

SENTENCING MEMORANDUM to be filed electronically with the Clerk of the

Court and counsel of record through ECF.


/s/ Samuel Lord
Trial Attorney
Environmental Crimes Section
U.S. Department of Justice